Good morning, your honors. Tom Allingham for the appellants, John Jane and minor child Jane Doe. I would like to reserve, if the court would permit, two minutes for rebuttal. Two minutes, fine. Your honors, the district court granted summary judgment to the Indian River School District that its policy of opening school board meetings with a prayer at meetings where impressionable school children with routine independence did not violate the establishment clause. I want to focus on two, what I believe to be errors in the district court. The first is, whether the district court wrongly applied the legislative prayer exception in Marshfield Chambers instead of the general prohibition on government composition and delivery of official prayers as set forth in the Supreme Court's decision in the Review-Wiseman. That in a situation in which the prayers were delivered to school children who had powerful incentives to attend those board meetings and who, as a practical matter, could not have sent themselves during the prayers. Why isn't the school board a deliberative body like a legislature? I mean, it does enact policy, doesn't it? They're elected, they vote, just like a legislature. The school board has characteristics of a deliberative body, but I submit to the court that the real question here should be whether, should not be a label that is applied to the particular government body delivering and composing the prayer. It should be whether, and I'll frame the question this way, whether this case, under these circumstances, is closer to the Marsh situation, based as it was on a specified historical confluence between a particular practice and the adoption by the people engaged in that practice of the Constitution at the same time. And where the court emphasized that the audience, the person who was complaining about the prayer, was a non-impressionable adult. Whether this situation is more like that. You're focusing on the rationale for the Marsh decision, not the distinction between the two bodies. Exactly. What is the theory on which the court decides? Or should this case be viewed much more like the situation in Lee v. Wiseman, in which recognizing the general proposition that the government should not be in the business of composing and delivering prayers, and recognizing that that rule is particularly powerful in the public school context. And then asking this question. Are the children to whom these prayers in Indian River were being delivered, in essentially exactly the same situation as the plaintiff in Lee v. Wiseman? In neither case, will all come to the same end. Don't children go to the galley and sit and listen to the opening of a legislature? Of course they do. But that's precisely my point, Your Honor. The field trip example that was given in my friend's brief. Those children are free to walk in and walk out whenever they want. They're in a gallery. They are not persons with powerful personal incentives to be there. Whether it's to receive an award from the highest authority in the district, whether it's to perform for the highest authority in the district, whether their group will not be as good if they're not there. Whether the students can walk out as well during the prayer? No, Your Honor. And I think that as a practical matter, they can't. Actually, isn't that the opening statement that's made at these school sessions? That you're free to walk out or you're free to ignore what we're doing? Yes, that statement is made, and as with the disclaimer language in many of this court and the Supreme Court's cases, just saying so doesn't make it true. The evidence on this is very powerful. Because what you say is peer pressure? Yes, and it's not only peer pressure, Your Honor. There is direct evidence and unrebutted direct evidence that individual members of the audience in this case felt coerced to bow their heads and pretend that they were participating in a prayer exercise they did not want to participate in. Let me read you a statement from Marsh v. Chambers, which you had mentioned. This is from Justice Berger. He says, Opening of sessions with prayers is deeply embedded in the history of this country. Legislative prayer has coexisted with religious freedom. Now, if you applied that statement to this case, would you have a problem? I would not have a problem, and this comes back to the point Your Honor and I were talking about a minute ago. The Marsh case turns on two things. One, the historical confluence between the opening of congressional sessions with a prayer and the adoption of the Bill of Rights. And two, a balance between that historical recognition and the fact that there was no danger that impressionable school children would be, whether by peer pressure or implicit coercion or whatever, and there are many phrases used for it in Lee v. Wagner and other cases, whether children will be coerced into participating in a prayer exercise they do not want to be coerced. If the school board did its prayer before children were invited in the room, you would have no problem with that. In fact, Your Honor, I asked board members on deposition, you could as easily seek divine guidance, which was their definition of what solemnity meant. You could seek divine guidance offstage. God hears you everywhere. And they acknowledged that, in fact, it was their view that God would hear them everywhere. Your problem is not with prayer, whether sectarian or non-sectarian, by the school board. Your problem is the presence of children. Well, I would be a little broader than that. Children crystallize the issue. My problem is the inherent coercion implicated by a governmental body offering a prayer at a meeting at which people have an incentive to appear. That is broader because it doesn't factor in whether children are present or not. But I don't need, really, Your Honor, to go so far as the point I was making. Lee v. Wiseman makes crystal clear that the peer pressure imposed on children is a paramount concern in these settings. And that should be what we should be looking at. Not the label of whether this is a deliberate body or not a deliberate body. Are the theoretical underpinnings of Marsh present? And they aren't. Or are the theoretical underpinnings of Lee v. Wiseman present? And they are. That's what we should be looking at. Lee v. Wiseman, if I remember, dealt with the graduation ceremony. He did, Your Honor. Why is that factual context important for this case? I mean, you have to attend a graduation, generally, if you would like to get your diploma. But you don't really have to attend a school board meeting. I'm aware, Your Honor, that I'm not supposed to interject personal points, but I did not attend my high school graduation. And the court in Lee v. Wiseman... Were you being sanctioned at the time? And the court in Lee v. Wiseman acknowledged that graduation was voluntary. I acknowledge that with one exception, practical exception, the attendance by these students at India River is also voluntary. But in each case, there are powerful incentives to attend. In fact, I'll give you an example. The receipt of awards by students for academic achievement, for extracurricular achievement, implicates exactly the same kind of considerations that Lee v. Wiseman talked about in the graduation. It is the exchange among people you respect, among your family members, of mutual admiration and recognition for an accomplishment. That is what the graduation is. That is what Lee Wiseman... Those are the words that Lee v. Wiseman used to describe that incentive. So it is with these awards. I mean, imagine a fourth grader who's going to get... who won this felony and wants his parents, her parents, to watch her walk up to the podium and get that award. She's not going to say, I don't want to go. It is voluntary. Of course it's voluntary. But put yourself in the shoes of that child. This is not materially different than a graduation. Both are voluntary. Both have powerful incentives. And let's keep in mind, in the case of the India River School District, the extension of the invitation to receive that award in the presence of your family or the people whom you respect and love comes from your school. What is the problem with the prayer itself, Mr. Alley? I mean, you would not object to all prayer. Or do you? I object... Again, Your Honor, I object to, and I'm going to make this the narrowest thing possible, but let's just assume for the moment that Marsh applies. And I do not believe that it does for the reasons we've just been talking about. But let's assume that it does. I object at a minimum to a body of prayer, to the exploitation of a prayer opportunity that advances one system or one faith or belief. Well, policies, it leaves it wide open, right? It can be anything. But your argument is that as applied, it's only been Christian prayer. That is exactly my argument, and that when it is only Christian prayer, or to say it a little bit more specifically, when the only faith system on which any prayer has been based has been the Christian faith system. The school has a policy concerning prayer. The school does have a policy concerning prayer. And listed, I guess, the protocol for the prayers that are conducted at the meetings. But they didn't focus on Christian. I thought that they mentioned Judeo-Christian, maybe Hindu, maybe Muslim, so that it covered a tremendous variety of religions. Sure, Your Honor. You can say a board member can offer any prayer, including Hindu, Buddhism, Judaism, Christianity, whatever according to the board member's conscience. And then I'll take an absurd example. Board members routinely get up and say, as I said to make my point in deposition, Lord, please help us to convert each and every one of the heathens in the audience tonight. Now, I don't think that any court in this land would say, notwithstanding that the policy says you can do whatever you want according to your conscience and use whatever faith system you want, if the board routinely exploits that prayer opportunity provided by that policy, which is exactly the language from Rushfield Chambers, to advance one and only one faith system, which is what the evidence is here. So if they rotated the faiths that the prayer centered upon, that would be okay? First, Your Honor, that's a hypothetical question. That is a question that I think was addressed in the Pelfrey case. And in the Pelfrey case, the court... I think the Pelfrey case works extremely well for me, because in the Pelfrey case they looked at the Marsh test and said, we are okay here because it is manifestly clear that multiple faiths are being prayed. That is, multiple faith systems are being used as the basis for prayers. And therefore, this does not advance one faith system. But that's not our case. Let me just clarify one thing. Is your objection that the prayers establish religion, religion broadly speaking? Or is it that they are sectarian? I think those two... I know that many cases have talked about a separate test for sectarian versus establishment and advancement of one faith, Your Honor. I think the easiest way to think about this problem is not to worry about compartmentalizing it. I think that this is an establishment case. I think it is an establishment case for two reasons. One, under Levy-Wiseman, the government just can't do this at all. But even if this is a Marsh case, we know from Marsh that if the government entity that offers the prayers, composes and delivers the prayers, uses that prayer opportunity consistently over a three-year period, as the district court found, or over a ten-year period, as one of the board members testified, to offer prayers based only on one faith system, that is an establishment. I think it's sectarian, too. But it is establishment under any definition. Very good. Mr. Ellingham, your time is up. Can I ask just one question? Who enforces the policy? The board enforces the policy, Your Honor. And that offers a serious problem of entanglement, which the district court recognized. Now here we have a system in which the board members themselves compose the policy, compose the prayer, and the board members themselves evaluate whether it complies with their own policy. And so, you know, you have a situation in which the board is essentially the playwright, the actor, and the film critic. Now, of course, the court always has the jurisdiction to decide whether what they did was right or wrong, whether the judgment that they made about whether... I'll give you an example, Judge Roth. I asked one of the board members whether my hypothetical prayer, O Lord, please convert the heathen, would be antithetical or contrary to the policy, and the board member said, I'm not sure. You know, that's a problem under the entanglement problem of the Lemon Test. But the answer, Your Honor's question, is the board itself judges its own prayers. Is the case best reviewed under the Lemon Test or the endorsement test? Yes, it's the Lemon Test, Your Honor. In my judgment, because for all the reasons that we've discussed, and under the Lemon Test, as I said, the district court has already essentially found that the entanglement problem was not satisfied. It was, depends on how you look at it, but it was violated here because of the points that Your Honor asked about, Judge Roth. And so I think that the Lemon Test applies, and that summary judgment can be entered for the plaintiffs because Judge Finan has already found that there was excessive entanglement. We'll get to that. Thank you very much. Mr. Gossin? Yes, Your Honor. My name is Jason Gossin. I represent the Indian River School District. I think the threshold question here that has to be addressed is what exactly is the government entity from which these invocations emerges? And it's a school board, and the plaintiffs really skip over any sort of an analysis of what the function and the role of a school board is. And they really just jump right to the main point, which is that there is the incidental presence of students. In a district, by the way, that has over 8,000 students. Can we focus on that incidental word that you just mentioned? Sure. Because it doesn't seem to comport with the record that I've been looking at. I got the impression that this was a very popular type of session where students like to go because they receive awards, there's an ROTC opening because that's where students are recognized for academic achievement, athletic achievement, et cetera, et cetera. And I understand that at one point there was a request that we stop inviting so many students because we're getting a little crowded. So when you say incidental, I wonder if the record bears that out. Well, I think when I say incidental, what I mean is that the board can function perfectly well without having any students there, and that's what they had done for most of the history of this board. Not that what the board is doing is not commendable. I think it's a great program to get the students involved. I agree. I do think it's a good thing for the board members to see the people for whom they are creating policy every month. But when I say incidental, I'm talking about whether they are essential to the functioning of the board, and they are not. For most of the history of this board, students did not routinely attend the board meetings. But it's an open public meeting where the crowd is supposed to be interacting with the board, right? Otherwise, the board can meet in private. Well, it is an open public meeting. There is some possibility of interacting, but that really is for a comment section at the end for the most part. The board is performing its obligations of discussing appropriate policy, determining how to spend the board's budget, doing adult sorts of things, governmental. Their function is governance. It is not pedagogical. They are not there because they are offering programming activities for students. They are there because they are setting the policy as a legislative body for this political subdivision. You said that students are not relevant for the functions that the board performs, but is that relevant for purposes of whether the prayer that is recited to open the session is valid or not? I think if we are going to skip over asking what kind of body this is and talk about is there some sort of something improper, some sort of coercion that was a reference to peer pressure and the invocation of the Lee v. Weissman case, there is a big difference between what a school board does and what a school does. Programming activities that are geared solely for the pedagogical objectives of the district and the students, such as graduation, such as extracurricular activities like football games, things like that. If you look at the cases, I think what you see is that the courts have applied the analysis of Lee v. Weissman when you are dealing with something that is geared for essentially student programming types of activities. That is not what we have here. What about the student who wants to appeal their disciplinary action? They have to show, don't they? That would be wise. Yes, they do have to show. What I don't think has come out, but what the record shows is that these meetings are often four or five hours long. The disciplinary proceedings take place. They don't take place in the public. They take place at the end. It is very easy for a person who is required to attend a public meeting, isn't it? I don't believe the record says that. I believe the record says that the disciplinary proceedings take place in the executive session. If I'm mistaken on that, I'm sure Mr. Allingham will tell me that or point that out in the rebuttal. But my understanding is that disciplinary does not take place in the open. It's done in the executive session. Couldn't the prayer be given in the executive session? I think the prayer couldn't be given in the executive session. It's given as part of the opening ceremony, so to speak, because the purpose of it is to, the purpose of solidifying the proceedings is to make a statement that important things are happening here. But isn't that for the members of the board to appreciate? It is, but I think that the, I mean, what the board is trying to do is to make it crystal clear to people who are there that this is, that this invocation, which may involve a prayer, it may not involve a prayer, by the way, this invocation is meant to solidify the proceedings and that takes place in conjunction with the presentation of the colors and the Pledge of Allegiance and other activities that are meant to invite a sense of decorum and dignity to the proceedings. Very good purposes, I think, but the way it's done, as I understand it under the school policy, is that the members of the board rotate so that each can have a chance of presenting some prayer, even silence. But the reality is that the prayers are taking a very Christian slant, if I understand the record correctly, in that very often Jesus Christ is invoked, which of course turns it into something else, which turns it into a religious Christian prayer in a school setting. I don't agree with that, Your Honor. It's not correct. If we start from the premise that you're not allowed to have any prayer, I'm not sure if that's what the plaintiff's position here is because I've heard that sometimes, and I've heard that just this kind of prayer is bad other times, but if you start from the premise that you can't have any prayer, then this discussion is moot. If you start from the premise that Marsha applies and you're allowed to have an invocation to solidify your proceedings, the next question then is, well, how are we going to do it? How are we going to do it? Marsha, in fact, applies. I believe Marsha does apply. It's because you have to ask, what is this body? It is a legislative body. But to answer your question, if prayer is permitted, if this is under Marsha and prayer is permitted, the next question is, well, how does this happen? How does this invocation take place? What should the policy of the school board be? And what the board has tried to do is come up with a policy that is consistent with the commands of Marsha, and it can't be proselytizing. It must be for solidifying the proceedings, and it can't be used to disparage another religion. And beyond that, we are not going to tell people how they can pray. If the Constitution says that there can be a prayer and invocation, they can do that, but it has to be consistent with the purpose, and the board is not going to dictate to people how to do it. This is something that we're reluctant, and we've been in discussion as to what to say exactly. What's going on here? The board policy is not going to dictate to the board members how to do it. What if the policy is valid, and the purpose is valid? The reality is completely different, because what is being offered is one prayer after another. Well, in Marsh, it was acknowledged that historically the prayers were offered by a member of a single sect, and I believe it was Presbyterian, and there was no record of multiple religions offering prayer in that record. And even for a long part of the history, the prayers were overtly sectarian, and they were Christian. And the court in Marsh said, we're not going to parse the content of the prayers. We're going to look at what the purpose is, and are they going over the line in terms of the purpose, not what they say? Well, your admissory points out that apparently there was, I guess, some evidence that the chaplain actually sanitized his prayers to take out overtly Christian parts. So, I mean, is that a fact that matters here? I think actually that's a fact that demonstrates why this policy is the right way for it to be done. The notion that you're going to tell a pastor to sanitize his prayers, I mean, what does that mean? It means you are now prescribing the content of prayer. That would be an entanglement if we're talking about Lenin, telling them you can say this, but you can't say this. This is religious enough, this is too religious. That's the problem. We live in an increasingly multi-religious society. This policy is the right way to do it. In Marsh, there had been an objection by a Jewish member of the legislature about Christ being mentioned in the chaplain's invocations, and that was removed. Now, that takes a certain amount of examination of the content of the prayer, does it not, to make sure that that change in policy is being recognized? I mean, it would take a certain amount of examination of the policy on the part of the pastor, and if somebody says, you know, I wish you'd use something that's a little bit more secular, a little less sectarian, and the pastor goes along with that, I think that's perfectly fine, but when a school district is crafting a policy, I think it's more problematic to say we're going to have a policy and we're going to command the manner in which we've concluded that it's okay to have an invocation, to have a prayer. That's okay. We're now going to tell people how they can do it. That's where you're running into problems, and Marsh doesn't require that. Marsh does not require that. I don't think this court should require that. To a certain degree, you are telling them what they can or cannot do because they can't proselytize, right? Well, only because, not because it's a religious, it's not a general proclamation that people aren't allowed to proselytize. It says if you're going to participate in this activity that solemnifies the proceeding, you have to be doing something that solemnifies the proceeding, and if you want to proselytize, you're free to do that, but you do that on your own time. That requires a certain review of the content of what the prayer is going to be if it cannot be proselytizing. That's true. I think that came up at the very end. Who is policing these board members to make sure that what they're doing is proper? And the answer is, so far, there really hasn't been an instance where somebody went over the line and was proselytizing, but if you look at the record in this case, what happens here is when somebody raises a concern, and that's what happens, they look at the policy, and everybody wants to do what's lawful, and the possibility that somebody might go over the line doesn't mean that permissible activity has become impermissible. You're actually pointing out that Marsh, at least doesn't fall in Marsh, because I suppose you could say the regular presence of children is a factor here that was not present in Marsh. Do you have a response to that? I do. Well, he said that Marsh turned on the fact that children were there. It does say adult there. Pardon me? It does say adult. Yeah. To me, it doesn't mean that it seems to me. When I read Marsh, I don't get any sense that it was only adults, and I think anybody who's ever been to the legislature knows that it involves students in the gallery from time to time. Well, the legislators have to be of a certain age to become a legislator, right? Right. But I don't think the fact that students may be incidentally present changes the analysis. If students are there, if some students are there, and by the way, nobody has ever been forced to go to the portion of the meeting that involves the prayer. I don't think that's the problem. It's not somebody being actually compelled to go there. It's actually the peer pressure that apparently exists for students to show up, to receive awards, to participate, or to advise the board about student government affairs. The distinction is, and this was actually recognized in Me v. Weissman, a graduation ceremony is like any other school activity where people, although Mr. Allingham doesn't, but most people generally go to their graduation, they feel like they have to do that. The Lee court distinguished a graduation from a legislative session where people are coming and going and there's a buzz of activity. That's what goes on here. These meetings take place in the auditorium, typically. The board members are up in the front, and then there's a large gallery section where people are coming and going all the time. If somebody doesn't want to be present when this brief invocation is offered, they don't have to be there. They simply don't have to be there. So there is no, if any of them wanted to go because they're getting an award and they don't want to miss getting the award, they don't have to be at the five-minute beginning where this invocation is offered, along with the Pledge of Allegiance and along with the presentation. The Supreme Court in Allingham v. American Civil Liberties Union, you're probably familiar with the case, warned against broad application of MARSH and focused on, in fact, the historical rationale for the MARSH decisions. In addition to that, there are only three courts of appeals decisions that have addressed whether MARSH applies to school. All three say no. Now, it seems to me that you're running up against a jurisprudence, and maybe you can talk about that. That's why I think it's very important to look at what type of body are we talking about and to examine the functions of this body. You do have an argument that even if MARSH does not apply, you should prevail anyway. I do.  It does not. I think MARSH is the correct analysis here, and I don't think it requires a broad reading or a narrow reading. If you read the words of it, it says a legislative or other deliberative body. The record here is that this is a legislative or other deliberative body. Judge Farman went through all of the factors that make it thus. We did the same thing in our briefing. I could go on about what those factors are. I don't think it's necessary. Whether you apply it broadly or narrowly, I don't think a question here because it applies to this case just on the facts and just on the words of MARSH. Let me ask another question. The Sixth Circuit in Coles, that was a virtually identical situation, wasn't it? Yes. And you're just saying the Sixth Circuit was wrong and we should not find it persuasive?  I think the analysis of Judge Farman in going through, I think Judge Farman did an excellent job of examining the factors that make this a legislative body. I think that's significant, and that's what's persuasive here. Is there a point that you agree with Mr. Allingham that the Lemon analysis applies here? I'm sorry? Do you agree with him that the Lemon? I do not. But if it does apply, I think the judgment of the district court should still be affirmed. Which is the test that you think should be used, the endorsement test? The Lemon test. You think the Lemon test applies? I think under any test. I don't think this is an endorsement of revision because of the secular purpose. Well, that would be the result of use of the test. But should we use the Lemon test or the endorsement test to determine whether these prayers are valid or not? Perhaps I'm just thick, but I think we ought to use the MARSH test. I don't see it as a choice between Lemon or endorsement. I see it really as a choice between Lemon and MARSH, although I don't think it's as close to the call as Mr. Allingham thinks. So if we choose not to apply MARSH here in Crabble, are you? Pardon me? If we decide that MARSH is not applicable, you're just going to fold your tent? No. We're not going to fold our tent. If you're applying the Lemon test, I think that we still prevail on the Lemon test. It was a clear legislative purpose. There is an incidental advancement of religion, but that's not the primary effect. The primary effect of this policy is to solemnify the proceedings. And the way they set this up is designed to ensure that there would not be an entanglement. And I think you would end up with an entanglement if you begin to prescribe how a prayer can be said. Very good. Thank you, Mr. Gosling. Mr. Allingham, you have two minutes rebuttal. Thank you, Your Honors. Mr. Gosling agreed that the Board can meet in private. And, in fact, the Board does meet in private in the Executive Session and in special meetings. And that illustrates the motivation of the Board here. They do not pray in those meetings. They pray only in public meetings. And why? Because, as Board Member Wilson testified, we want the public to take part in the prayer. That's the whole thing behind the public Board meeting. And I asked him, so the Board prayer, in some way, is for the benefit of everyone in attendance. And he said, that's exactly right. Now... What if everybody bowed their heads in a moment of silence? I think a moment of silence is contentless and very distinguishable from what we have here, Your Honor. And this policy does contemplate that you can do a moment of silence and, a couple of times, Board Members have done a contentless moment of silence. But in 99% of the time, or 100% of the time, if you listen to some of the Board Member testimony, if there is a faith system that's being advanced upon which the prayers are based, it's always Christian. So would you please be characterized as an as-implied case? Do you have a beef with the policy itself? Sure. Because this is a Lee v. Wiseman case. So the policy violates Lee v. Wiseman. You should never have a situation in which the government composes and delivers and judges the propriety of prayers in this context. So yes, it is both as-implied and as a matter of law. It's the policy and the practice. Yes, exactly. When Mr. Gosnell described how the practice here comports with the policy, he left out one word from the policy and from Marsh. He said, the policy tells you you can't proselytize. And he said, the policy tells you you can't disparage. But he left out the word from Marsh, which is also in the policy, that the prayer opportunity can be exploited to advance one's faith. And that's what happened here. Mr. Ellingham, your time is up. Thank you. Thank you very much. Thank you, Mr. Gosnell. Very difficult case. Very well argued. We will take the case under advisement.